### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MBC GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01869-TWP-TAB |
| | ) | |
| CONDUENT STATE & LOCAL SOLUTIONS, | ) | |
| INC. Successor by Merger to CONDUENT | ) | |
| HUMAN SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>ENTRY ON PENDING MOTIONS</u>

This matter is before the Court on Defendant Conduent State & Local Solutions, Inc.'s ("Conduent"), Second Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (Filing No. 40), and Plaintiff MBC Group, Inc.'s ("MBC") Objection to Magistrate's Discovery Order (Filing No. 51), Motion to Stay Briefing and Briefing Deadlines on Conduent's Second Motion to Dismiss Pending a Ruling on MBC's Objection to Magistrate's Discovery Order (Filing No. 52), Motion for Leave to File Second Amended Complaint (Filing No. 53), Motion for Leave to File Reply Brief (Filing No. 62), and Objection to Magistrate's Briefing/Stay Order (Filing No. 63).

This action relates to a prime government contract (the "Prime Contract") for staffing services between Conduent and the Indiana Family and Social Services Administration ("FSSA"), and a related subcontract (the "Subcontract") between Conduent and MBC. MBC alleges that Conduent breached both contracts by failing to subcontract a certain amount of work to MBC, and that Conduent was unjustly enriched when it performed that work itself.  Conduent moves for dismissal of all claims with prejudice and seeks attorneys' fees.  For the following reasons, the Court **grants** Conduent's Second Motion to Dismiss, albeit without prejudice as to some claims,

**denies** Conduent's request for attorneys' fees, **denies in part as moot** MBC's Motion for Leave to File Second Amended Complaint, and **denies as moot** all remaining pending motions.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of MBC as the non-moving party.  See Bielanski v. County of Kane, 550 F.3d 632, 633 (7th Cir. 2008).

The facts alleged in the Amended Complaint are substantively the same as the facts alleged in the original complaint, which Judge Robert L. Miller, Jr. ("Judge Miller") concisely summarized in the Court's August 18, 2023 Opinion and Order in this case ("August 2023 Order"):

> The Prime Contract provides that Conduent would provide staffing services to the Indiana Family and Social Services Administration. It says the State awarded the Prime Contract to Conduent in part because of its Indiana Veteran Owned Small Business ("IVOSB") participation plan. It lists MBC as an IVOSB subcontractor that would participate in 3.05 percent of services under the Prime Contract. The Prime Contract requires Conduent to submit copies of its agreements with IVOSB subcontractors to the Indiana Department of Administration's IVOSB Division. The IVOSB Division must review and approve any requests for changes to the IVOSB participation plan. Conduent's "failure to comply with the provisions in [the IVOSB] clause may be considered a material breach of the [Prime] Contract."
>
> The complaint includes excerpts from the Indiana Division of Supplier Diversity's Minority and/or Women's Business Enterprise ("MBE/WBE") and IVOSB policy statement, which says contractors must use IVOSB subcontractors at their committed participation percentages and outlines the procedures for modifying the IVOSB participation plan. Those procedures involve the subcontractor signing a notification document and the Division interviewing interested parties, including the subcontractor, to determine whether a change is appropriate.
>
> Conduent and MBC entered into the Subcontract pursuant to the Prime Contract's directive. The Subcontract says MBC will perform a portion of services under the Prime Contract for Conduent, as described in the Statement of Work. The Statement of Work provides that MBC (but not Conduent) must comply with the terms of the Prime Contract, and it incorporates particular parts of the Prime Contract by reference. The Subcontract doesn't explicitly include the 3.05 percent participation rate listed in the Prime Contract. . . .

2

The Subcontract provides that "Conduent has the primary responsibility for performance under the Prime Contract" and may perform, obtain from another entity, or otherwise remove any portion of the services being performed by MBC with 30 days' written notice to MBC. Conduent agrees to pay MBC based on MBC's invoices for services rendered and other pre-approved costs, subject to Conduent's approval. The Subcontract says it is the entire agreement between the parties and supersedes any prior agreements that aren't specifically referenced and incorporated into the Subcontract.

MBC alleges that it began providing services "under the Prime Contract" to Conduent in 2019, and it and Conduent executed the Subcontract on February 20, 2020. As of August 1, 2022, Conduent has paid MBC $1,931,972.87. MBC alleges that Conduent has received $188,837,021 under the Prime Contract, so MBC is entitled to 3.05 percent (which it calculates as $5,759,529.14). MBC alleges Conduent either performed services that should have been allocated to MBC, contracted the services out to another provider, or a combination of the two, but did so without amending the Prime Contract's IVOSB participation plan or giving it 30 days' notice under the Subcontract.

MBC sent Conduent an invoice for the difference between the amount Conduent has paid and the amount it alleges Conduent owes. Conduent disputes that it owes MBC the money and has refused to pay….

(Filing No. 31 at 2–5 (alterations in original) (footnotes and internal citations omitted).)

In September 2022, MBC filed a complaint in state court.  Conduent removed this action to federal court and moved to stay discovery pending resolution of a forthcoming motion to dismiss (Filing No. 1; Filing No. 16). The Magistrate Judge granted the motion to stay discovery, and a few days later, Conduent filed its motion to dismiss (Filing No. 19; Filing No. 20). On August 18, 2023, Judge Miller dismissed MBC's claims without prejudice[1] (Filing No. 31).

On September 7, 2023, MBC filed an Amended Complaint, which is now the operative pleading (Filing No. 35). On September 29, 2023, Conduent filed a Second Motion to Dismiss (Filing No. 40) and a motion to stay discovery pending the Second Motion to Dismiss (Filing No.

---

[1]The Southern District of Indiana had one of the heaviest weighted caseloads in the country, and Judge Miller graciously accepted a designation by the Seventh Circuit to hear cases in this district.  With his impending retirement from the bench, on August 29, 2023, this case was reassigned from Judge Miller to Chief Judge Tanya Walton Pratt (Filing No. 33).

42). On November 2, 2023, the Magistrate Judge again granted Conduent's motion to stay discovery ("Discovery Stay Order") (Filing No. 50). On November 10, 2023, MBC objected to the Discovery Stay Order (Filing No. 51) and moved to stay briefing on the Second Motion to Dismiss pending the objection to the Discovery Stay Order (Filing No. 52). MBC has also moved for leave to file a reply in support of its objection to the Discovery Stay Order (Filing No. 62).

On November 16, 2023, MBC filed responded in opposition to Conduent's Second Motion to Dismiss (Filing No. 54)[2] and filed a Motion for Leave to File Second Amended Complaint ("Motion for Leave") (Filing No. 53). Then, on November 29, 2023, Conduent moved to stay briefing on the Motion for Leave pending its Second Motion to Dismiss (the "Motion for Extension") (Filing No. 58). The Magistrate Judge granted Conduent's motion (the "Briefing Stay Order") (Filing No. 59), and MBC filed an objection to the Briefing Stay Order (Filing No. 63).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual

---

[2] The filing of MBC's response mooted its motion to stay briefing on the Second Motion to Dismiss (Filing No. 52).

allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III.   <u>DISCUSSION</u>

In total, six motions are pending before the Court. In this Order, the Court will discuss only Conduent's Second Motion to Dismiss because it is dispositive of portions of MBC's Motion for Leave,[3] and it is entirely dispositive of the four remaining motions. The arguments raised in the briefing on the Second Motion to Dismiss were or could have been raised in briefing on Conduent's first Motion to Dismiss, and many of them were addressed by Judge Miller in the August 2023 Order. Nevertheless, the Court will offer additional analysis to help the parties streamline future briefing and avoid the unnecessary repetition of unsuccessful arguments.

MBC's Amended Complaint, like its original complaint, asserts three claims: Count I for breach of the Prime Contract, Count II for breach of the Subcontract, and Count III for unjust enrichment. In its Second Motion to Dismiss, Conduent raises the same arguments it raised in its first Motion to Dismiss: Count I must be dismissed because MBC is not a third-party beneficiary

---

[3] For the reasons explained in this Order, portions of MBC's Motion for Leave to File a Second Amended Complaint must be denied as moot, even though the Motion for Leave is not yet ripe.

to the Prime Contract; Count II must be dismissed because MBC cannot adequately state a claim for a breach of any provision of the Subcontract; and Count III is barred by the existence of the Prime Contract and Subcontract. Conduent also reasserts its request that the Court strike MBC's request for attorneys' fees. Conduent asks that the Court dismiss all of MBC's claims with prejudice and award it fees and costs. MBC's response, which is, in substance, a motion to reconsider Judge Miller's August 2023 Order, argues that MBC's claims are adequately pled, and even if not, dismissal with prejudice would be improper because no discovery has yet occurred. The Court will address MBC's three claims in turn, and then discuss each party's requests for attorneys' fees.

**A.**     **Count I: Breach of the Prime Contract**

MBC's claim for breach of the Prime Contract is based on the Prime Contract's IVOSB compliance provision (the "IVOSB Provision"), which states that Conduent will commit 3.05 percent of its work under the Prime Contract to MBC (Filing No. 35-1 at 13). MBC contends that Conduent failed to subcontract at least 3.05 percent of its work to MBC in violation of the IVOSB Provision. MBC is not a party to the Prime Contract but alleges it may enforce the Prime Contract as a third-party beneficiary. Conduent argues that MBC has failed to sufficiently allege its third-party beneficiary status, and that Count I should be dismissed with prejudice (Filing No. 41 at 11–19). The Court will address whether the Amended Complaint adequately pleads a third-party beneficiary claim before discussing whether dismissal with prejudice is appropriate.

**1.**     **Whether MBC Has Sufficiently Alleged Breach of the Prime Contract**

To enforce a contract as a third-party beneficiary, the third party must show (1) a clear intent by the contracting parties to benefit the third party; (2) a duty imposed on a contracting party in favor of the third party; and (3) that performance of the contract is necessary to render the intended benefit to the third party. *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001).

6

"[T]he intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Luhnow*, 760 N.E.2d at 628. Intent "'must affirmatively appear from the language of the instrument when properly interpreted and construed,'" though the intent to benefit a third party need not be demonstrated any more clearly than intent regarding any other terms of the contract." *OEC-Diagnostics, Inc. v. Major*, 674 N.E.2d 1312, 1314–15 (Ind. 1996) (quoting *Freigy v. Gargaro Co.*, 60 N.E.2d 288, 291 (Ind. 1945)).  The requisite intent "is not a desire or purpose to confer a particular benefit upon the third-party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him." *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 276 (Ind. Ct. App. 2001); *Kirtley v. McClelland*, 562 N.E.2d 27, 37 (Ind. Ct. App. 1990) ("To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party."). "It is not enough that performance of the contract would be of benefit to the third party." *Kirtley*, 562 N.E.2d at 37.

In the August 2023 Order, Judge Miller held that MBC's original complaint failed to adequately allege that the contracting parties (Conduent and the FSSA) intended to directly benefit MBC (Filing No. 31 at 5–11).  Specifically, Judge Miller held that the IVOSB Provision, without more, did not adequately establish MBC's third-party beneficiary status.  Judge Miller also rejected MBC's attempt to distinguish analogous caselaw and its argument that the Prime Contract incorporated certain State policies that impose duties in favor of MBC.  *Id*. at 8–10.

Count I in the Amended Complaint is substantively the same as Count I in the original complaint. The new allegations largely consist of legal arguments that are repeated in MBC's response brief (Filing No. 35 at 6–7).  Conduent therefore argues Count I should be dismissed for the same reasons articulated in the August 2023 Order (Filing No. 41 at 13).  MBC asserts a variety

of arguments in response, which the Court distills down to four primary arguments: (1) the Court misapplied Indiana law in the August 2023 Order and in two cases on which the August 2023 Order relies; (2) the face of the Prime Contract establishes MBC's third-party beneficiary status; (3) the parties' course of conduct demonstrates an intent to benefit MBC; and (4) evidence of circumstances surrounding the execution of the Prime Contract establishes an intent to benefit MBC.

### a.    Application of Indiana Law

MBC challenges Judge Miller's conclusion that being named a participant in the Prime Contract's IVOSB Provision does not "automatically establish" that the contracting parties intended to benefit MBC (Filing No. 54 at 7–9; Filing No. 31 at 10). In reaching this erroneous conclusion, MBC contends, Judge Miller misapplied well-established Indiana law and improperly relied on two other decisions from this Court—*ESG Technical Services, LLC v. Advantage Health Solutions, Inc.* ("*ESG*") and *Bucher & Christian Consulting, Inc. v. Novitex Enterprise Solutions, Inc.* ("*Bucher*")—that likewise misapplied Indiana law. (Filing No. 54 at 8); ESG, No. 09-cv-00030, 2011 WL 2267550 (S.D. Ind. June 6, 2011) (Pratt, J.); Bucher, No. 15-cv-00010, 2015 WL 5210539 (S.D. Ind. May 22, 2015) (Pratt, J.).  MBC states that this "'not automatically established' rule is made of whole cloth" and "does not accurate [sic] reflect Indiana third-party beneficiary law," and that *ESG* and *Bucher* should therefore be reconsidered (Filing No. 54 at 7–8).

MBC argues that under Indiana law, "the intent to benefit the third party . . . *may* be shown by specifically naming the third party or by other evidence," so being named in the IVOSB Provision thus establishes MBC's third-party beneficiary status. *Luhnow*, 760 N.E.2d at 628 (emphasis added); *see, e.g.*, *St. Paul Fire & Marine v. Pearson Constr.*, 547 N.E.2d 853, 856 (Ind. Ct. App. 1989).  MBC's position appears to be based on a misunderstanding of the word "may". While Indiana courts have consistently held that naming a third party in a contract *may* show an

intent to benefit that third party, no Indiana court has held that it *does* show intent.  Importantly, Indiana courts construe and use "may" as a permissive term, not a mandatory one.  *See Siddall v. City of Michigan City*, 485 N.E.2d 912, 915 (Ind. Ct. App. 1985); *Bochner v. State*, 38 N.E.3d 228 (Table), 2015 WL 4468776, at *2 (Ind. Ct. App. 2015) ("The term 'may' in a statute 'ordinarily implies a permissive condition and a grant of discretion."); *see also Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 456 (Ind. 1999) ("A defendant's state of mind . . . *may* be shown by indirect or circumstantial evidence. The question of whether there is *sufficient* evidence . . . . is a question of law . . . ." (emphasis added)); *Eifler v. State*, 570 N.E.2d 70 (Ind. Ct. App. 1991) (stating that intent to defraud "*may* be shown by circumstantial evidence," but that evidence "must be *sufficient*" (emphasis added)). This Court's conclusion that naming a third party only "may" show an intent to benefit that third party, and does not "automatically" show an intent, is based on the proper application of Indiana law.

MBC raises additional criticisms of the Court's analyses in *ESG* and *Bucher*.  MBC argues that in *ESG*, the Court improperly cited Seventh Circuit decisions that applied Illinois and New Jersey law, and not Indiana law. The *ESG* court's citation to persuasive Seventh Circuit authority was not improper. 2011 WL 2267550, at *6.  And the Court's conclusion in *ESG* was appropriately supported by the well-established principle that under Indiana law courts must determine the contracting parties' intent by viewing "the contract as a whole and 'not from detached provisions thereof,'" like a single reference to a third party.  *ESG*, 2011 WL 227550, at *5–6 (citing *McClain's Estate v. McClain*, 183 N.E.2d 842 (Ind. Ct. App. 1962)).  As for *Bucher*, MBC takes issue with the Court's analysis of *Luhnow v. Horn*, 760 N.E.2d 621 (Ind. Ct. App. 2001).  In *Luhnow*, the plaintiff-landowners, the Luhnows, sued for breach of contract as third-party beneficiaries, but the trial court denied the claim on summary judgment.  The Court of Appeals affirmed the denial,

stating that the contract "[did] not show a clear intent to directly benefit landowners, such as the Luhnows" because: "[t]he Luhnows [were] not specifically named in the contract, nor [were] landowners as a class named"; "the contract addresse[d] only the rights and obligations of the two contracting parties"; and the "other evidence" of intent cited by the Luhnows showed, "at best," that the contracting parties' knew the Luhnows "would derive an incidental benefit from the contract." *Id.* at 629–30.  MBC states: "[c]ritically, the Indiana Court of Appeals did ***not*** hold that such a specific indication of the Luhnows would only be 'evidence of intent' that 'may' establish third-party beneficiary status" (Filing No. 54 at 8–9 (emphasis in original)). But conversely, the *Luhnow* court did not state that a specific reference to the Luhnows *would have* established their third-party beneficiary status. The *Luhnow* court only explained that any evidence that might have shown an intent to benefit the Luhnows—including, but not limited to, a name reference—was absent from the contract. *Luhnow*, 760 N.E.2d at 629–30.

In sum, under Indiana law, a specific reference to a third party is only evidence of intent to benefit that third party; it is not necessarily sufficient evidence.  Stated differently, a reference to a third party does not "automatically establish" third-party beneficiary status.  *See Ind. Gaming Co., L.P., v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000) (holding that technicians were not third-party beneficiaries to contract, despite provision requiring that technicians be paid union wages for work); *see also Xirum v. U.S. Immigr. & Customs Enf't*, No. 22-cv-00801, 2023 WL 2683112, at *16–21 (S.D. Ind. Mar. 29, 2023) (applying Indiana law, finding detainees were not third-party beneficiaries to detention contract, despite being the subject of the contract).  The Court correctly applied Indiana law in *ESG*, *Bucher*, and its August 2023 Order.

MBC further argues that even if not erroneous, *ESG* and *Bucher* are distinguishable in two ways.  First, in those cases, the contractors and third-party MBE/WBEs never executed

subcontracts (Filing No. 54 at 20–24). MBC contends that if the subcontractors in *ESG* and *Bucher* had executed subcontracts, like MBC did, then those subcontractors would have been third-party beneficiaries to the prime contracts. Judge Miller called this reading of *ESG* and *Bucher* "too great a stretch" (Filing No. 31 at 8), and it is. In *ESG*, the Court stated that "ESG and Advantage [the contractor] had to reach a legally binding agreement before ESG had any enforceable rights." *ESG*, 2011 WL 2267550, at *7. MBC reads this statement to mean that ESG and Advantage needed to execute a subcontract for ESG to have enforceable rights against Advantage *under the prime contract*, but that is not what the Court held. The Court held that ESG and Advantage needed to execute a subcontract for ESG to have any enforceable rights *whatsoever* against Advantage. The *ESG* court explained that the prime contract "indicate[d] further steps were necessary before a subcontractor gained *any rights* against Advantage. *Any contractual rights of the subcontractors would derive from being a party to the subcontract and not from being a third-party beneficiary to the State contract*." *Id.* at *7 (emphasis added).[4] In *Bucher*, the Court similarly held that the prime contract's "requirement of a separate, later-executed subcontract . . . supports the proposition that the [prime contract] itself was not specifically intended to confer a benefit on [the subcontractor]." *Bucher*, 2015 WL 5210668, at *12. So while the lack of subcontracts in *ESG* and *Bucher* factually distinguishes those cases from this one, it does not support MBC's third-party beneficiary claim. To the contrary, the fact that Conduent and MBC executed a Subcontract only confirms that Conduent and the FSSA intended for the Subcontract, and not the Prime Contract, to govern MBC and Conduent's relationship.

Second, MBC argues *ESG* and *Bucher* are distinguishable because in those cases, the prime contracts did not impose any obligations on the contractor in favor of the subcontractors. But here,

---

[4] MBC contends that this statement is "mere dicta" (Filing No. 54 at 24), but it is not. This statement sets forth the Court's reason for dismissing the plaintiff's third-party beneficiary claim. *ESG*, 2011 WL 2267550, at *10.

the Prime Contract incorporates Indiana Department of Administration ("IDOA") policies that impose obligations in MBC's favor, which shows that the parties intended to benefit MBC.[5]  In the August 2023 Order, Judge Miller rejected this argument, finding that: (1) the Prime Contract did not incorporate IDOA policies; and (2) even if it did, the IDOA policies only established duties in favor of the State, not MBC (Filing No. 31 at 9–10). MBC challenges both of these conclusions.

MBC argues that Judge Miller erred in concluding "that Conduent had not incorporated the IDOA/DSD compliance rules and regulations into the Prime Contract," but MBC fails to show how Judge Miller's finding was erroneous (Filing No. 54 at 18).  Instead, MBC simply recites the same contractual language that Judge Miller found unpersuasive and, without citing any caselaw or offering any analysis,[6] concludes that Conduent "is clearly bound by the DSD Compliance regulations." *Id.*  MBC offers no basis for reconsidering or departing from Judge Miller's analysis. For the same reasons explained in the August 2023 Order, the Court concludes that the Prime Contract did not incorporate IDOA policies (Filing No. 31 8–11).

Next, MBC argues that Judge Miller erred in concluding that even if an IDOA policy had been incorporated into the Prime Contract, the "policy was not imposed in favor of the third party" (Filing No. 31 at 9; Filing No. 54 at 18).  MBC cites one new piece of evidence to show that IDOA policies create duties to specific third parties—a DSD Change in Participation Notification form (the "Change Form") (Filing No. 54 at 19, n. 15; Filing No. 53-1 at 206).[7] MBC contends that the

---

[5] This argument conflates the first element of a third-party beneficiary claim—a clear intent to benefit a third party—with the second element—a duty imposed on one of the contracting parties in favor of the third party. The alleged duty imposed on Conduent in favor of MBC is the duty to assign 3.05 percent of its work to MBC (Filing No. 54 at 17), so the Court addresses this argument in context of the first element of MBC's third-party beneficiary claim.

[6] In prior briefing, MBC also failed to "present any argument or citation on this topic" (Filing No. 31 at 10).

[7] The Change Form was not attached to the pleadings or MBC's response brief (Filing No. 54 at 19). A footnote in MBC's brief contains a URL that is presumably meant to direct the Court to the form, but that URL is invalid. But even if the Change Form were properly offered and admissible, it would not show that IDOA's policies create any duties in favor of any specific entity, much less MBC.

Change Form "***confirms that Conduent's IVOSB commitment***, as provided in the Prime Contract, ***flows*** not simply to the State of Indiana, but also to MBC in particular" ([Filing No. 54 at 19](#) (emphasis in original)).  But the Change Form is merely a blank form.  It is not an IDOA policy, it does not cite any IDOA policy, it is not incorporated into any IDOA policy, and it does not refer to any particular IVOSB, MBE, or WBE.  To the contrary, the Change Form's generic reference to "your firm" could apply to any IVOSB, MBE, or WBE.  The Change Form does not show that the IDOA policies create any rights in favor of MBC, or any particular IVOSB, MBE, or WBE.

There was no error in the Court's application of Indiana law in *Bucher*, *ESG*, or the August 2023 Order.  The Court finds no reason to depart from the analyses in those decisions and declines MBC's invitation to reconsider them ([Filing No. 54 at 8](#)).

### b.      Face of Prime Contract as Evidence of Intent

MBC next argues that the contracting parties' intent to benefit MBC is evidenced by the IVOSB Provision ([Filing No. 54 at 9](#)).  For the reasons explained in the Court's August 2023 Order, under Indiana law, the IVOSB Provision, without more, does not demonstrate a clear intent to directly benefit MBC. MBC contends that the Court only reached this conclusion by inappropriately applying a more stringent standard for showing intent than what is required under Indiana law.  *Id*.  But MBC fails to show where the Court allegedly applied an incorrect standard, and MBC's disagreement with the Court's application of the correct standard does not save its claim from dismissal.

### c.      Course of Conduct as Evidence of Intent

MBC further argues that "MBC provided staffing services to Conduent on the FSSA in 2019 ***before*** the Subcontract was executed in February 2020," which "is further evidence that the named parties intended to create a third-party beneficiary relationship ***under the Prime Contract alone*** and that the Subcontract is, in fact, subordinate to the Prime Contract" ([Filing No. 54 at 16](#)

(emphasis in original)). However, MBC's third-party beneficiary claim concerns the intent of the FSSA and Conduent, not MBC and Conduent. The Prime Contract expressly anticipates that Conduent and its subcontractors will enter into a separate subcontract, which shows that the FSSA and Conduent intended for that subcontract to govern Conduent's relationship with its subcontractors. *Bucher*, 2015 WL 5210668, at *12 ("[The] requirement of a separate, later-executed subcontract thus supports the proposition that the [prime] Contract itself was not specifically intended to confer a benefit on [the subcontractor]."); ESG, 2011 WL 2267550, at *7 ("By requiring a legally binding agreement between Advantage and its subcontractors, the contract itself indicates further steps were necessary before a subcontractor gained any rights against Advantage."). The fact that Conduent and MBC delayed executing a subcontract has no bearing on whether the FSSA and Conduent intended to benefit MBC at the time they executed the Prime Contract.

### d.    Circumstances Surrounding Execution of Prime Contract

MBC lastly argues that certain extrinsic evidence of circumstances surrounding the execution of the Prime Contract shows the contracting parties' intent to benefit MBC. MBC first cites a State Executive Order, a section of the Indiana Administrative Code, and statements on the website for the IDOA Division of Supplier Diversity (Filing No. 54 at 13). None of this evidence was attached to MBC's Amended Complaint, but even if the Court could consider it, it would not save MBC's third-party beneficiary claim from dismissal.

The State of Indiana's institution of and commitment to an IVOSB program does not demonstrate that the State intended for it or its contractors to assume direct obligations to IVOSBs, and it certainly does not demonstrate an intent to directly benefit MBC in particular. This evidence, at most, shows that the State has a desire to promote the welfare and success of IVOSBs by

14

increasing (though not guaranteeing) their participation in government contracts. *Centennial Mortg., Inc.*, 745 N.E.2d at 276.  As the Court explained in *ESG*,

> …there is no doubt the State has a noble goal of encouraging equal opportunity for [IVOSBs] to participate in the State's award of contracts. While the State might intend to benefit or advance the interests of [IVOSBs] as a whole, the [IVOSB] program does not automatically establish [MBC] as a third-party beneficiary. Therefore, for [MBC] to show that the parties intended to benefit it as a third-party beneficiary, [MBC] must present evidence that the parties specifically intended to benefit [MBC] and not simply an intent to benefit [IVOSBs] generally.

*ESG*, 2011 WL 2267550, at *5 (internal citations omitted).

MBC also cites certain procurement documents (the "Procurement Documents") as evidence of the State's intent to directly benefit MBC. These documents, which MBC admits may not even be complete, were not attached to the Amended Complaint.  Nevertheless, even if the Court could consider these documents, they do not support MBC's claim.  The Procurement Documents contain the same type of aspirational, non-specific language as the IVOSB Provision, including statements that: the State has a "reasonable expectation" of IVOSB "subcontracting opportunities"; Conduent "agrees to be bound by the regulatory process" governing the IVOSB program; Conduent believes that "[p]artnering with [IVOSB] first is a win-win for all parties"; Conduent "is dedicated to including historically underutilized businesses" in its contracts; and the Prime Contract was awarded to Conduent, in part, because of its commitment to subcontracting a certain portion of work to IVOSBs.  *Id.* at 15.  As Judge Miller explained in the August 2023 Order, this language of the Prime Contract does not show an intent to benefit MBC (Filing No. 31 6–8). This language, like the IVOSB Provision, does not even guarantee that MBC would receive any subcontracted work from Conduent. The language merely shows that Conduent aspires to promote the welfare of IVOSBs generally.

MBC insists that evidence of other circumstances surrounding the execution of the Prime Contract would show that it is an intended third-party beneficiary, but no such circumstances are

alleged in the Amended Complaint.  As such, the Court is not persuaded to deviate from Judge Miller's analysis in the August 2023 Order.  Count I must be **dismissed**.

    **2.**    **<u>Whether Dismissal with Prejudice is Appropriate</u>**

Conduent argues that MBC has not and cannot adequately allege a third-party beneficiary claim, so dismissal with prejudice is appropriate. MBC responds that dismissal with prejudice would be improper because it has not yet conducted discovery, which MBC believes would yield extrinsic evidence related to the contracting parties' intent (Filing No. 54 at 33). However, contemporaneously with its response brief, MBC filed a proposed Second Amended Complaint (Filing No. 53-1). As Conduent notes in its reply brief, MBC's filing of a Second Amended Complaint contradicts its position that it needs to conduct discovery before it can adequately plead a third-party beneficiary claim (Filing No. 60). MBC could have waited until the Court ruled on its objection to the Discovery Stay Order, and, because no Case Management Order has been entered, MBC was not subject to a deadline to move to amend its pleading. Yet MBC chose to file a proposed Second Amended Complaint anyway. MBC must believe that its Second Amended Complaint adequately pleads a third-party beneficiary claim, despite the stay of discovery, or else MBC would not have filed it. Fed. R. Civ. P. 11(b)(2). The Court therefore concludes that the lack of discovery does not preclude dismissal with prejudice.

Nevertheless, the Court declines to dismiss Count I with prejudice because MBC purports to cite new extrinsic evidence of circumstances surrounding the execution of the Prime Contract, which may affect the adequacy of MBC's claim. As the Seventh Circuit has explained:

> In determining the intention of the parties to a contract, Indiana courts—in addition to ascertaining the plain meaning of the contract terms—have a "duty to consider … the surrounding circumstances which existed at the time the contract was made," including "the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract."

*Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 381 (7th Cir. 2010) (quoting *Ruff v. Charter Behav. Health Sys. of Nw. Ind., Inc.*, 699 N.E.2d 1171, 1176 (Ind. Ct. App. 1998)); *see Closson v. Billman*, 69 N.E. 449, 450 (Ind. 1904) ("In the construction of . . . every other contract, the true question is: What was the intention of the parties, as disclosed by the instrument read in the light of the surrounding circumstances?"); *see also Centennial Mortg., Inc.*, 745 N.E.2d at 276 (considering extrinsic evidence of circumstances surrounding formation of building renovation contract); *Gordon v. Finch*, No. 21-CV-292, 2023 WL 3160297, at *4 (N.D. Ind. Apr. 28, 2023) (considering extrinsic evidence of reason for including certain provisions in contract); *Best Flooring, Inc. v. BMO Harris Bank, N.A.*, No. 12-cv-5, 2013 WL 164237, at *4 (S.D. Ind. Jan. 15, 2013) (denying motion to dismiss third-party beneficiary claims on motion to dismiss because a letter "and several other facts" raised claim "beyond the speculative level").

In its Motion for Leave, MBC claims it has obtained new extrinsic evidence regarding the FSSA's and Conduent's intent.  Because it is possible that this evidence could raise MBC's third-party beneficiary claim beyond the speculative level, MBC will be given a final opportunity to plead its claim.[8]  Count I is **dismissed without prejudice**.  Briefing on MBC's Motion for Leave **shall proceed** as to Count I.  If leave to amend is denied, however, the dismissal of Count I will be converted to a dismissal with prejudice.

## B.   Count II: Breach of the Subcontract

In Count II, MBC alleges that Conduent breached the Subcontract by failing to commit a certain amount of work to MBC and by failing to timely notify MBC that Conduent would be performing some work itself. Conduent argues that MBC's claim fails because the Subcontract does not govern the amount of services Conduent must assign to MBC, and MBC's alleged

---

[8] The Court does not presently decide whether the Second Amended Complaint adequately alleges a third-party beneficiary claim.

damages for breach of the Subcontract's notice requirements are barred by the Subcontract (Filing No. 41 at 21–24). The Court will discuss whether MBC has adequately stated a claim for breach of the Subcontract before addressing Conduent's request for dismissal with prejudice.

### 1. Whether MBC Has Sufficiently Alleged Breach of the Subcontract

Count II alleges that Conduent breached two obligations under the Subcontract: its obligation to commit a certain amount of work to MBC; and its obligation to notify MBC of changes to the IVOSB participation plan. The Court will address each argument in turn.

### a. Breach of Obligation to Allocate Work

In the original complaint, MBC alleged that the IVOSB Provision was incorporated into the Subcontract, and that Conduent breached the Subcontract by failing to allocate 3.05 percent of its work to MBC (Filing No. 1-2 at 7). Judge Miller concluded that as a matter of law, the Subcontract did not incorporate the IVOSB Provision, so MBC could not succeed on its breach of Subcontract claim (Filing No. 31 at 14). MBC now concedes that the Subcontract does not incorporate the IVOSB Provision but still alleges that the Subcontract obligates Conduent to commit a certain amount of work to MBC.  Only MBC's legal theory has changed (Filing No. 54 at 25–26).[9]

MBC contends that the Prime Contract and Subcontract must be construed together under New York law, and, when construed together, a "latent ambiguity" arises "as to what services were committed to MBC under the Subcontract."  *Id.* at 26–27.  MBC states that "Conduent's assertion that it has no contractual duties to provide MBC with any work at all, under the Subcontract, as interpreted by Judge Miller, cannot be squared with its express commitment of '3.05% of the ***total***

---

[9] To the extent MBC's response brief purports to argue that the Subcontract incorporates the IVOSB Provision, that argument is undeveloped and therefore deemed waived. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

*contract value* to MBC Group' as provided in the Procurement Documents." *Id.* at 27 (emphasis in original). MBC's new arguments do not save Count II from dismissal.

MBC's argument that the Prime Contract and Subcontract should be construed together is, in substance, an argument that the Subcontract incorporates the Prime Contract's provisions, which Judge Miller previously rejected (Filing No. 31 at 11–13). Regardless, MBC's present argument about construing instruments together is unavailing. Under New York law, courts will construe related instruments together only "[i]n the absence of anything to indicate a contrary intention." *BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 112 A.D.2d 850, 852 (N.Y. App. 1985) (citing *Nau v. Vulcan Rail & Constr. Co.*, 36 N.E.2d 106 (N.Y. 1941)). As Judge Miller noted, the Subcontract and Prime Contract's integration clauses indicate that the parties intended for the instruments to be construed separately (Filing No. 31 at 10-11). The fact that the Prime Contract and Subcontract were executed by different parties more than a year apart further militates against reading these instruments together. *See In re Gulf Oil/Cities Service Tender Offer Litigation*, 725 F. Supp. 712, 731–32 (S.D.N.Y. 1989) (declining to read a Merger Agreement and Offer to Purchase together because both documents contained integration clauses and Merger Agreement was not physically attached to the Offer to Purchase."); *see Murat v. S. Bend Lodge No. 235 of the Benev. & Protective Order of Elks of the U.S.*, 893 N.E.2d 753, 757 (Ind. Ct. App. 2008) ("[T]he [contemporaneous document doctrine] should be applied cautiously when the documents involve different parties.").

Further, the terms of the Prime Contract do not give rise to any latent ambiguity in the Subcontract. Under New York law, a "latent ambiguity" arises when a contract provision could apply to different facts, objects, or circumstances. *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023). For example, "[i]f a person contracts for value to bequeath 'my house to my daughter,'" the contract would appear unambiguous on its face. *Id.* "Nonetheless, if application

of the terms of the contract to the facts reveals that the person making the commitment had two houses (or two daughters) and nothing in the terms of the contract clarifies which house (or daughter) was intended," then the contract would present a latent ambiguity.  *Id.*

There is no similar ambiguity in the Subcontract.  The Subcontract provides that MBC will perform services for Conduent and that Conduent will compensate MBC for those services ([Filing No. 35-2 at 2](#)).  MBC identifies no ambiguity as to the type of work it was required to perform for Conduent or the terms of payment. The parties' disagreement relates solely to the amount of services Conduent must assign to MBC under the Prime Contract.  The Subcontract is silent on that topic, so the Subcontract contains no possible ambiguity as to that topic.  MBC has failed to adequately allege a claim for breach of the Subcontract based on an alleged obligation to commit a certain amount of work to MBC.

**b.      Breach of the Subcontract's Notice Provision**

The Subcontract contains a provision that permits Conduent to perform or outsource staffing services, but only upon thirty days' notice to MBC (the "Notice Provision") ([Filing No. 35-2 at 43](#)).  In the August 2023 Order, Judge Miller found that MBC had failed to adequately allege damages arising from a breach of the Notice Provision, though "[i]t might be possible" for MBC to do so.  The Amended Complaint expands on MBC's damages allegations, alleging that "MBC was deprived of the opportunity to perform . . . staffing services committed to it by Conduent under the Subcontract/Statement of Work. MBC, in turn, has suffered monetary damages in an amount to be proven at trial."  ([Filing No. 35 at 9](#).)

MBC contends that the Amended Complaint alleges "[a]t a minimum, MBC has sustained lost profits" ([Filing No. 54 at 29](#)).  However, Conduent argues that the Subcontract precludes MBC from recovering lost profits.  The Subcontract states, in relevant part:

**21. LIMITATION OF LIABILITY**      Except for liability provided under Sections 8 . . . Section 19 . . . and Section 20 of this Subcontract . . . , **NEITHER PARTY SHALL BE LIABLE, UNDER ANY CIRCUMSTANCES FOR ANY ANTICIPATORY OR LOST PROFIT, LOST REVENUE, SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, OR INDIRECT DAMAGES OF ANY KIND . . . RESULTING FROM THE PERFORMANCE OR NON-PERFORMANCE OF ITS OBLIGATIONS UNDER THIS SUBCONTRACT EVEN IF THOSE NON-DIRECT DAMAGES ARE ATTRIBUTED TO BREACH OF THIS SUBCONTRACT** . . . .

([Filing No. 35-2 at 6](#)-7 (emphasis in original)).

The enforceability of a liability limitation provision, like the above provision, is an affirmative defense.  However, the Court may consider this affirmative defense at the motion to dismiss stage.  *See Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 157 A.D.3d 579, 580 (N.Y. App. Div. 2018) (considering liability limitation affirmative defense on motion to dismiss). Under New York law, contractual liability limitations are generally enforceable. "The [New York] Court of Appeals has recognized that '[a] limitation on liability provision . . . represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor.'"  *Electron Trading, LLC*, 157 A.D.3d at 580 (quoting *Met. Life Ins. Co. v. Noble Lowndes Int'l*, 643 N.E.2d 504 (N.Y. 1994)). The contracting parties "'may later regret their assumption of the risks of non-performance in this manner, but the courts let them lie on the bed they made.'" *Noble Lowndes Int's*, 643 N.E.2d at 507s (quoting 5 Corbin, Contracts § 1068, at 386).

MBC argues that the limitation on liability provision is unenforceable because Conduent "committed the first material breach of the contract" and "has unclean hands" ([Filing No. 54 at 20](#)). However, the affirmative defenses cited by MBC are not the appropriate standard for determining whether a limitation on liability provision is enforceable. Under New York law, liability-limiting provisions are unenforceable only when,

> in contravention of acceptable notions of morality, the misconduct for which it
> would grant immunity smacks of intentional wrongdoing. This can be explicit, as
> when it is fraudulent, malicious or prompted by the sinister intention of one acting
> in bad faith. Or, when, as in gross negligence, it betokens a reckless indifference to
> the rights of others, it may be implicit.

*Kalish-Jarco, Inc. v. City of New York*, 448 N.E.2d 413, 416–17 (N.Y. 1983). "The type of

intentional wrongdoing that could render a limitation [provision] unenforceable is that which is

unrelated to any legitimate economic self-interest. Stated otherwise, a party can intentionally

breach a contract to advance a legitimate economic self-interest and still rely on the contractual

limitation provision." *Electron Trading, LLC*, 157 A.D.3d at 581 (internal citations and quotation

marks omitted).

While the Amended Complaint may allege an intentional breach of the Notice Provision,

it does not allege the type of egregious, "sinister" wrongdoing necessary to invalidate the liability

limitation provision.  At best, MBC alleges that Conduent intentionally breached the Subcontract

to retain a larger portion of funds under the Prime Contract, which would be in Conduent's

economic self-interest.  Because MBC's Amended Complaint fails to allege a viable claim for

breach of the Subcontract, Count II must be **dismissed**.

## 2.    Whether Dismissal with Prejudice is Appropriate

When a complaint fails to state a claim for relief, a plaintiff is ordinarily given a chance to

amend the complaint to correct the problem.  *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir.

2013).  However, leave to amend need not be granted if amendment would be futile.  *Garcia v.

City of Chi.*, 24 F.3d 966, 970 (7th Cir. 1994).  Once a plaintiff has had one or more opportunities

to cure the defects but fails, the court may dismiss claims with prejudice.  *See Dittman v. ACS

Hum. Servs. LLC*, No. 16-cv-16, 2017 WL 819685, at *5 (N.D. Ind. Mar. 1, 2017) (dismissing

plaintiff's third amended complaint with prejudice when plaintiff failed to allege sufficient factual

matter and it appeared he would never be able to do so); *see also Norman v. N.W. Ind. CA Section*

*8*, No. 21-CV-158, 2021 WL 4363012, at *5 (N.D. Ind. Sept. 24, 2021) (dismissing second amended complaint with prejudice when the plaintiff had been given opportunities to amend her complaint).

Here, MBC has had ample opportunity to plead a viable claim for breach of the Subcontract but has been unable to do so. MBC has failed to show that the Subcontract incorporates the IVOSB Provision or otherwise obligates Conduent to commit a certain amount of work to MBC, and MBC fails to allege that it has suffered any recoverable damages as a result of Conduent's breach of the Subcontract's Notice Provision.

MBC's proposed Second Amended Complaint shows that MBC would not be able to successfully plead a claim for breach of the Subcontract even if given another opportunity to amend. Count II of the Second Amended Complaint repeats, almost verbatim, the latent ambiguity arguments raised in MBC's response brief and alleges that Conduent's breach of the Notice Provision caused MBC to suffer lost profits, which are not recoverable (Filing No. 53-1 at 19-22). MBC has been, and will be unable to, plead a viable claim for breach of the Subcontract. Accordingly, Count II is **dismissed with prejudice**, and MBC's Motion for Leave to File Second Amended Complaint is **denied as moot** as to Count II.

## C.     Count III: Unjust Enrichment

In Count III, MBC alleges Conduent was unjustly enriched by its performance of services that should have been subcontracted to MBC (Filing No. 35 at 9-10). Conduent argues this claim should be dismissed with prejudice because the existence of the Prime Contract and Subcontract bar any equitable recovery (Filing No. 41 at 28-29). As with MBC's first two claims, the Court will discuss the adequacy of the claim and then the request for dismissal with prejudice.

### 1. **Whether MBC Has Sufficiently Alleged Unjust Enrichment**

In the Amended Complaint, MBC clarifies that Count III is alleged in the alternative to Count I only (*Compare* Filing No. 1-3 at 8 *with* Filing No. 35 at 9). Count III in the Amended Complaint is otherwise identical to Count III in the original complaint. Conduent simply repeats the same arguments raised in its first Motion to Dismiss—the existence of express contracts (the Prime Contract and Subcontract) bars MBC's unjust enrichment claim (Filing No. 41 at 28). In response, MBC argues that Count III is properly alleged in the alternative to Count I and that its "unjust enrichment claim arises out of the 3.05% IVOSB provision in the Prime Contract only" and "does not arise out of the Subcontract" (Filing No. 54 at 30). The Court will discuss whether the existence of either contract precludes MBC's claim for unjust enrichment.

### a. **Whether Prime Contract Bars Unjust Enrichment**

Conduent argues that MBC cannot seek equitable relief based on the IVOSB Provision because Conduent admits that the Prime Contract exists, but MBC argues it may seek equitable relief because the parties dispute whether MBC may enforce the Prime Contract. The pertinent question, then, is whether a plaintiff may seek equitable relief based on an express contract to which the plaintiff is not a party. Based on caselaw from the Indiana Supreme Court, the answer is "yes."

In *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213 (Ind. 2009), the City of East Chicago (the "City") and Showboat Marina Partnership ("Showboat") entered into a development agreement for the operation of a riverboat casino. The agreement provided that if Showboat received a gaming license from the Indiana Gaming Commission ("IGC") and began operating the casino, Showboat would contribute a portion of its revenue to organizations for the benefit of the City. Showboat promised, in part, to donate one percent of its adjusted gross receipts to East Chicago Second Century, Inc. ("Second Century"), and Second Century promised to

24

undertake local development activities.  The IGC issued a gaming license to Showboat, based in part on Showboat's and Second City's promises.  *Id.*  Over the next several years, Second Century received approximately sixteen million dollars from Showboat.  However, an investigation by the Indiana Attorney General revealed that much of those funds "could not be accounted for and could be traced to Second Century's principals."  *Id.*  Second Century filed a declaratory judgment action, seeking to ensure that the revenue payments would continue.  The Attorney General intervened and alleged unjust enrichment.  The Attorney General argued that "the State conferred a measurable benefit on Second Century by 'mandating the payments in the first place as a condition precedent to the [IGC's] authorization of the gaming license,'" and that it would be unjust "to allow Second Century to retain the benefit of [the] funds without fulfilling its obligation to engage in the economic development" of the City.  *Id.*

Second Century moved to dismiss the unjust enrichment claim as barred by the existence of the development agreement.  *Id.* at 220.  The trial court dismissed the unjust enrichment claim, but the Indiana Supreme Court held that the dismissal was erroneous.  The Indiana Supreme Court explained that "[t]here was an express contract in this transaction, but it was not one to which the Attorney General or the State were parties. . . . That transaction is thus not a bar to the Attorney General's claim for unjust enrichment, an equitable remedy."  *Id.* at 221.  The *Zoeller* court further explained that the terms of the development agreement "were intended to control the rights and duties of [Second Century] and the casino licensee in relation to each other; they were not intended to control the rights of any non-parties."  *Id.*

Under *Zoeller*, as long as the parties dispute whether MBC may enforce the Prime Contract, the Prime Contract's existence does not bar MBC's alternative unjust enrichment claim.

25

###### b.      Whether Subcontract Bars Unjust Enrichment

Conduent also argues that MBC has no equitable right to enforce the IVOSB Provision "because MBC's agreement with Conduent is governed solely by the Subcontract, which does not include the term MBC wishes to enforce" (Filing No. 60 at 17).   MBC responds that the Subcontract does not preclude equitable recovery because the unjust enrichment claim arises out of a provision in the Prime Contract, not the Subcontract (Filing No. 54 at 31).

Under Indiana law, "[t]he existence of express terms in a valid contract precludes the substitution of and the implication in law of terms *regarding the subject matter covered by the express terms of the contract*."  *Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992) (emphasis added).   "[T]he existence of an express contract will not prevent a party from presenting to a jury a breach of contract theory and a quantum meruit theory if 'the express contract arguably cover[s] a different subject matter than that upon which [the plaintiff] sought a remedy in quasi-contract.'"  *Luse Thermal Techs., LLC v. Graycor Indus. Constructors, Inc.*, 221 N.E.3d 701, 719 (Ind. Ct. App. 2023) (quoting *City of Indianapolis v. Twin Lakes Enters., Inc.*, 568 N.E.2d 1073, 1079 (Ind. Ct. App. 1991)); *see Twin Lakes Enters., Inc.*, 568 N.E.2d 1073 (holding that trial court did not err in instructing jury on breach of contract and unjust enrichment claims because jury could have reasonably found that the parties' contract "arguably covered a different subject matter than that upon which [the plaintiff] sought a remedy in quasi-contract").

So if the Subcontract covers a different subject matter than the IVOSB Provision, which forms the basis of MBC's unjust enrichment claim, then the existence of the Subcontract would not bar the unjust enrichment claim.   However, the Amended Complaint alleges that the Subcontract and IVOSB Provision both cover the same subject matter—namely, the amount of

services that Conduent must subcontract to MBC[10] ([Filing No. 35 at 4](), 8–9; [Filing No. 54 at 28]()). Because MBC's unjust enrichment claim is not alleged in the alternative to its claim for breach of the Subcontract, MBC's unjust enrichment claim must be **dismissed**.

### 2. Whether Dismissal with Prejudice is Appropriate

The Court finds that dismissal of Count III would not be appropriate at this stage. For the reasons explained above, Count III is subject to dismissal because MBC's allegations about the scope of the Subcontract in Count II preclude equitable recovery. Because the Court is dismissing Count II with prejudice and denying MBC's Motion for Leave as to Count II, MBC's Second Amended Complaint may be able to properly plead Count III in the alternative to Count I. The Court therefore **dismisses** Count III **without prejudice**. Briefing **shall proceed** on MBC's Motion for Leave as to Count III. If leave to amend is denied, the dismissal of Count III will be converted to a dismissal with prejudice.

### D. MBC's Request for Attorneys' Fees

"A court may strike particular allegations if '[t]he Court unequivocally dismissed Plaintiff's claims based on these allegations with prejudice, thereby precluding Plaintiff from raising them again' in an amended complaint." *VitalGo, Inc. v. Kreg Trerapeutics, Inc.*, 370 F. Supp. 3d 873, 880 –81 (N.D. Ill. 2019) (citation omitted) (alteration in original)); *see* Fed. R. Civ. P. 12(f) (stating a court may strike "redundant, immaterial, impertinent, or scandalous matter"). The parties agree that MBC's request for fees and costs is based exclusively on a fee shifting provision in the Subcontract. Because the Court has dismissed MBC's claim for breach of the Subcontract with prejudice, MBC no longer has any basis for seeking attorneys' fees or costs. MBC's request for

---

[10] The Court does not presently decide whether the Subcontract and IVOSB Provision cover the same subject matter.

attorneys' fees and costs is therefore **stricken**, and MBC's Motion for Leave is **denied as moot** as to MBC's request for attorneys' fees and costs.

E.    <u>**Conduent's Request for Attorneys' Fees**</u>

The Subcontract provides that "[i]n the event of any claim, controversy, dispute, or litigation between the parties *arising out of or relating to this Subcontract*, the prevailing party will be entitled to recover from the losing party reasonable expenses, attorney fees and costs" (Filing No. 35-2 at 11 (emphasis added)).  In its request for fees, Conduent contends that all of MBC's claims, not just the claim for breach of the Subcontract, arise out of or are related to the Subcontract (Filing No. 60 at 17). Because the Court is not dismissing all claims with prejudice, an order awarding Conduent its fees would be premature.  The Court therefore **denies** Conduent's request for attorneys' fees, **without prejudice** to refile.

## IV.    <u>CONCLUSION</u>

For the following reasons, the Court **GRANTS** Conduent's Second Motion to Dismiss **without prejudice** as to some claims and **DENIES** Conduent's request for fees (Filing No. 40). Count I is **DISMISSED without prejudice**, Count II is **DISMISSED with prejudice**, Count III is **DISMISSED without prejudice**, and MBC's request for attorneys' fees and costs is **STRICKEN**.  MBC's Motion for Leave to File Second Amended Complaint (Filing No. 53) is **DENIED in part as moot** as to Count II and MBC's request for attorneys' fees and costs **REMAINS PENDING** as to Count I and Count III.  Briefing on MBC's Motion for Leave **shall proceed** as to only Counts I and III.

The Court also **DENIES as moot** MBC's Objection to Magistrate's Discovery Order (Filing No. 51), Motion to Stay Briefing on Second Motion to Dismiss Pending a Ruling on MBC's Objection to Magistrate's Discovery Order (Filing No. 52), Motion for Leave to File Reply Brief (Filing No. 62), and Objection to Magistrate' Judge's Briefing/Stay Order (Filing No. 63).

**SO ORDERED**.

Date:  2/23/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Matthew S. Tarkington
LEWIS & KAPPES PC
mtarkington@lewis-kappes.com

Taylor Webster
LEWIS KAPPES, PC
TWebster@lewis-kappes.com

Thomas R. Ruge
LEWIS & KAPPES PC
truge@lewis-kappes.com

Andrew W. Hull
HOOVER HULL TURNER LLP
awhull@hooverhullturner.com

Finis Tatum, IV
HOOVER HULL TURNER LLP
ftatum@hooverhullturner.com

Riley H. Floyd
HOOVER HULL TURNER LLP
rfloyd@hooverhullturner.com